Mr. Justice ITasner
delivered the opinion of the court.
This is an application by the petitioner for a writ of mandamus to enforce the payment to him, in his representative capacity, by the Treasurer, of the three drafts described in the proceedings.
In response to the usual rule to show cause, the Treasurer has filed an answer, and the question has been fully argued by the counsel.
The facts requisite to an understanding of the case appear to be as follows :
By a law passed May 1, 1882, entitled, “ Au act for the allowance of certain claims reported by the accounting officers of the United States Treasury Department,” it was enacted, “ That the Secretary of the Treasury be, and he is hereby authorized and required to pay, out of any money in the Treasury not otherwise appropriated, to the several persons in this act named, the several sums mentioned herein, the *369 same being in full for, and the receipt of the same to be taken and accepted in each case as a full and-final discharge ■of the several claims examined and allowed by the proper accounting officers, under the provisions of the act of July A, 1864, since December, 1880, namely * *• * to John J. Pulliam, of Fayette county, Kentucky, $1,223 ; to John J. Pulliam, of Fayette county, $545 ; to John J. Pulliam, ex’r of John N. Pulliam, deceased, of Fayette county, $3,020.”
Two drafts were issued by the Treasurer, payable by himself as Treasurer, to the order of John J. Pulliam, for the two suras first named, and a third draft payable to John J. Pulliam, as executor of John N. Pulliam, for the remaining sum.
These drafts were delivered to Halstead, the petitioner, the attorney and agent of John J. Pulliam, and are in his hands at this time.
John J. Pulliam, before endorsing the drafts, died in Tennessee, of which State he was a citizen. There has been no administration upon his personal estate in Tennessee, but an administrator was appointed in that State upon the personal estate of John N. Pulliam.
The petitioner, claiming to be a creditor of both of the Pulliams, applied to the Orphans’ Court of the District of Columbia for letters of administration upon the estate of each of the Pulliams, and obtained letters of administration from that court.
Afterwards, a bill was filed in equity in the Supreme Court of the District, by Keyser, as receiver of the Herman American Bank, against Halstead, as administrator, and against the Tennessee administrator of John N. Pulliam, claiming for the bank an interest in so much of the proceeds of the drafts as belonged to an agent of the Pulliams, by virtue of an assignment to the bank, and asking that the -bank’s claim should be recognized and discharged in the administration of the personal estates of the two Pulliams» To that bill Halstead, the administrator, answered, and a pro confesso decree was obtained against the Tennessee administrator of John N. Pulliam ; and after evidence taken, *370 a decree was passed appointing Halstead a trustee, and', requiring him to endorse the drafts in his quality of administrator and trustee, recognizing the claim of the bank, but directing the administrator to settle his accounts in the Orphans’ Court, and reserving final action upon the claim until that settlement.
The petitioner states that he endorsed the drafts according to the direction of the decree, and presented them for payment to the Treasurer, who refused to pay them ; and this petition is filed in the absence of any other remedy in the premises.
The death of the payees in the draft rendered it necessary that the payment should be made to some properly constituted representative of the deceased claimants. When such person should present them to the Treasurer it would appear that his duty to pay them was a perfectly plain oue, in no degree involving the exercise of anything in the nature of official discretion ; but more evidently a plain, ministerial function than this court recently held in the case of Key us.. Frelinghuysen,* was devolved upon the Secretary of State to-pay out money appropriated to discharge an award of the-Board of Commissioners under a treaty with Mexico.
That the petitioner’s appointment was regular is not a matter that can be questioned ordinarily in a proceeding like this. The Treasurer in this case, as in all others, has a right to ascertain whether the petitioner is the person he claims to be, but with the identification, ordinarily, the inquiry would end, and the payment be made.
But the Treasurer certifies in his answer, that he is-advised by the First Comptroller that notwitstandingthe action of the Orphans’ Court of the District of Columbia- in making the appointment, the petitioner has-no right to receive these awards, because they do not constitute personal assets of the deceased within this District,, which may rightfully be claimed by such an appointee, but that they are properly payable to the personal representative of the domicile where the claimants died, in the State-of Tennessee.
*371 Assuming that this defense may properly be made by the respondent, the only obstacle to the payment will be removed,, if by the decision of a competent court he is advised that the objection is not well founded.
The high official and personal character of the distinguished officials who present this reason for withholding-payment of the drafts renders it proper that the question should be carefully considered by this court, and we have given to the subject a painstaking examination.
That the position assumed by the Treasurer is at variance with the general principles governing the administration of the effects of a deceased person lying beyond , his place of domicile, is too plain for question. According to the universally admitted theory on the subject, the administrator of the domicile is powerless to sue or compel payment of money due the deceased beyond the limits of the territory where he was appointed, or to collect assets of the deceased in any other jurisdiction ; and nothing except a statutory provision, enacted in the place rei sitce, can confer such an authority.
Judge Story, in his work on the Conflict of Laws, sec-523, uses this language, after stating the principle in emphatic terms:
“ So strict is the principle that a foreign administrator cannot do any act as administrator in another State, that where the local laws convert real securities in the hands of an. administrator into personal assets, which he may sell or assign, he cannot dispose of such real securities until he has taken out letters of administration in the place rei sitceThus mortgages are declared by the law of Massachusetts-to be personal assets in the hands of administrators, and disposable by them accordingly. But the authority cannot be exercised by any except administrators who have been duly appointed within the State. So, if on the other hand an administrator sells real estate for the payment of debts, pursuant to the authority given him under the local laws, rei sitce, he is not responsible for the proceeds as assets in any other State, but they are to be disposed of and ac *372 counted for solely in the place and in the manner pointed out in the local laws.”
It is argued, however, that this general principle has no application in this District with respect to the moneys in the Treasury, and that this distinction is well settled by,the decisions of the Supreme Court in the cases of Kane vs. Paul, 14 Peters, 33, and Vaughan vs. Northrop, 15 Peters, 1.
In my opinion the language used in those cases is inapplicable to the existing state of the law wifhin this District, since the adoption by Congress of the Revised Statutes of the District in 1874.
The apparent generality of the language used by the court may be explained by the consideration that when those decisions were announced (1840-1), there was in force within the District of Columbia, as a constituent part of the testamentary law, the act of Congress of 24th June, 1812, which provided that it should be lawful for any person to whom letters of administration or testamentary should be granted in any of the United States or territories thereof, to maintain any suit or action or to prosecute or recover any claim in the District of Columbia in the same manner as if the letters of administration or testamentary had been granted within the District. This law came into force only eleven years after the establishment of the District, and in 1840 seemed to be as firmly fixed as any other part of the testamentary law, and as little likely to be repealed by Congress or omitted in any revision of the statutes as any other provision of the system ; and, as it appears to me, it was only because of the existence of this provision, merged as a constituent in the testamentary code at the time, that the court used the language referred to.
In the case in 14 Peters, the court only decided that letters of administration de bonis non cum testamento annexo granted in the District of Columbia on the personal estate of a non-resident'upon the allegation that the executors who had qualified in Maryland were dead, when one of them was really living, were, for that reason, void ; and that upon the appearance of that executor, the administrator d. b. n. *373 was bound to surrender to him the moneys he'had collected from the Treasury upon a claim of the deceased allowed by commissioners under a treaty with France.
The court did not undertake to decide that the grant of letters d. b. n. here would not have been valid if the executors had both been dead, as was represented to the Orphans’ Court when it made the appointment, but as it expressly says, the answer to the question whether the letters testamentary in Maryland should prevail over letters granted in the District of Columbia depends upon the legal character of the latter letters — •“ are' they void or voidable ” — and the court declares, as we have stated, that under the circumstances of the case they were “ void ab initio.”
But the court went further, and in answering the inquiry as to what rights letters testamentary or of administration granted in either of the States of the Union can give to an executor or administrator in the District of Columbia, except the right to sue given by the act of 1812, says, that “the-right to sue, i?i the mamier it is given, gives the right to such executor or administrator to receive from the Government, either in the District or in the State where letters have been granted, any sum of money which the Government may owe to a testator or intestate at the time of his death, or which may become due thereafter, or which may accrue from the Government to a testator in any way or at any time.”
In the case in 15 Peters, the question presented was whether the next of kin and heirs of an intestate, dying in Kentucky, could sustain a bill in equity in this District against a non-resident administrator of the deceased appointed in Kentucky, to recover their shares of a sum collected from the Treasury by the administrator for military services of the deceased. The court held that the act of 1812 did not authorize such a suit against the Kentucky administrator within the District of Columbia although he was summoned here ; but only empowered the foreign administrator to sue and prosecute and recover claims due the deceased, and that moneys so collected" from the Treasury constituted assets under the Kentucky administration, and *374 that distribution should be sought there. ■ It was in reply to the argument that the foreign administrator might be made liable here because the money was collected here and so constituted local assets within the District, that Justice Story, speaking for the court, said :
“The debts due from the Government of the United States have no locality at the seat of Government. The United States in their sovereign capacity have no particular place of domicile, but possess, in contemplation of law, an ubiquity throughout the Uniou ; and the debts due by them are not to be treated like the debts of a private debtor lohich constitute local assets in his own domicile. On the contrary, the administrator of a creditor of the Government, duly appointed in the State where he was domiciled at his death, has full authority to receive payment and give a full discharge of the debt due to his intestate in any place where the Government may choose to pay it, whether it be at the seat of government or at any other place where the public funds are' deposited. If any other doctrine were to be recognized, the consequence would "be that before the personal representative of any deceased creditor belonging to any State in the Uniou would be entitled to receive payment of any debt due by the Government, he would be compellable to take out letters of administration in this District for the due administration of such assets. Such a doctrine has never yet been sanctioned by any practice of the Government, and would be full of public, as well as private, inconvenience.”
So far as this opinion sustains the validity of a release by a foreign administrator of a debt due to his intestate, it is but a statement of undoubted law, which has been carried so far that it has been held that a bona fide voluntary payment to an administrator of a debt due to the estate is a legal discharge of the debtor, although the grant of administration afterwards proves to have been voidable or even void. Allen vs. Dundas, 3 T. R, 125, cited in 14 Peters, 41; see also Mackey vs. Coxe, 18 How., 104. And this is but an example of a class of cases where the court, in the interest of peace, and to prevent loss to'one who has acted bona fide under a *375 mistake induced by an appearance of right or title, sometimes refuses to subject the innocent debtor to the punishment of .a second payment without designing in the least degree to endorse the propriety of such a course for the future.
But that the opinion, so far as it declares it to be unnecessary for the foreign administrator to take out letters here (for it does not say he may not do so), is founded upon the feature of the testamentary law, which was engrafted upon it by the act of June 24,1812, in my judgment is sufficiently ¡shown in a subsequent paragraph, where the learned judge, in construing that act, says : “ It does not authorize any suits or actions in the District against any such executor or administrator. Its obvious design was, therefore, to enable foreign executors and administrators to maintain suits, and to prosecute and recover claims in the District, not against the Government atone, but against any person whatever, resident within the District, who was indebted to the deceased, and to discharge the debtor therefrom without the grant of any local letters of administration. In effect, it made all debts •due from persons within the District, not local assets, for which a personal representative would be liable to account in the coui’ts of the District, but general assets, which he had full authority to receive, and for which he was bound to •account in the court of the State from which he derived his •original letters of administration.”
It was the act of 1812, therefore, which, according to this statement of the court, had worked so marked a change in the general principles of the law of administration as to •convert local, assets into general assets ; and such words, clearly, would not have been used if that act had not been in existence.
This construction is strengthend by the language of the -court in the subsequent case of Mackey vs. Coxe, 18 How., 104. This was an action at law brought in this District ■against the sureties on the bond of one Raines, who was appointed by the Orphans’ Court of the District of Columbia .administrator upon the personal estate of Samuel Mackey, a •Cherokee Indian. There had been an administration at the *376 domicile of the deceased, and the administrators had constituted Raines their agent to draw the money. Rut it appears from the opinion of the court that the Treasury Department refused to pay Raines on this order, and required him to take out letters of administration here, which were accordingly granted him by the Orphans’ Court of the District. The Treasury officers then paid him the money j. and as agent "of the Cherokee administrators, Raines receipted to himself as administrator in the District for the money received. He lost his life and the money on his way home, and this suit was brought by the surviving administrator and distributees of the deceased. The court decided that the letters of administration in the Cherokee country were entitled to the same respect as those of any of the States ; and proceeding to consider the effect of the act of 1812, which it quotes at length, says: “ Under this law the money due to Mackey, might have been paid, and indeed should have been paid to Raines, the attorney-in-fact of the administrators of Mackey. But, through abundant caution* letters of administration were required to be taken out in this District as a prerequisite to the payment of the money by the Treasury Department.”
It thus appears that the court ascribes- the right of the Cherokee administrators to demand the money from the Treasury to the act of 1812, and to that alone. It nowhere says that the Orphans’ Court of the District was without authority to grant the letters, or that the claim against the Government was not assets in the District. Plis receipt to the Treasury as local administrator was recognized as a full discharge of the claim, and the Court throughout speaks of the administration as if it were perfectly valid. Thus, on page 104 it is said : “This suit is brought in the name of the surviving administrators of Mackey and of the distributees. .Regularly, an action of the distributees cannot be maintained, unless an application has been made to the Orphans’ Court in this District to order a distribution and to authorize or direct the administrator, Raines, to pay the-same. This administration being ancillary to that of the *377 domicil of the deceased, the distribution would be governed • by the law of the domicile.”
Justices Nelson and Curtis, in their separate opinion, stated that they concurred in the decision of the court, “ upon the ground that, as no final account had been settled by the administrators in the Orphans’ Court, and no order had been made by the court, either directing the administrator to pay the balance in his hands to the principal administrators, for distribution of them, or directing a distribution to be made by them, there was no breach of the bond. This being an ancillary administration, it depended upon the discretion of the Orphan’s Court which granted it whether the money remaining in the hands of the ancillary administrator, after the satisfaction of all claims in this jurisdiction, should be distributed here by the ancillary administrator or remitted to the principal administrators for distribution ;■ and until that discretion shall be exercised, and the ancillary administrator directed which of these courses to pursue, he is in no default, and his surety is not liable.”
Certainly there is no intimation here that the grant- of letters in the District was void or voidable or in any respect irregular ; or that the claim against the Treasury collected and receipted for by the administrator under his letters here, was not assets properly receivable by him like any other assets due the estate of the intestate within this jurisdiction, and these cases occurred while the act of 1812 was in full force.
In Story’s Conflict of Laws, already quoted, § 529 d, the •examination of the claims of administrations under different jurisdictions is continued as follows: “The subject came again under consideration before the same court in Mackey vs. Coxe, (just quoted) where it was decided that an administrator appointed in the Cherokee country might receive payment of a debt in the District of Columbia, and his discharge or that of his authorized attorney will be valid. But this is upon the ground that by the act of Congress he might sue in that District. He did, however, out of abundant caution, take out letters of administration in that District.” And *378 the author proceeds to state that the true law in regard to ■ancillary administration is stated in that case by Justices Nelson and Curtis in the opinion quoted above.
It seems quite evident that the learned author who had ■delivered the opinion in 15 Peters, attributed to the force of the act of 1812 alone the novel powers ascribed to foreign ■administrators within the District of Columbia in the decisions above referred to — powers that could not have been •claimed at the time within any other jurisdiction in the Union, and which at this time can rightfully be claimed nowhere, unless in virtue of a similar statute.
But, as is well known, since the adoption of the revision •of the District laws in June, 1874, the act of 24th June, 1812, is no longer in existence, and we are consequently remitted to the condition of the law in this respect as it existed before the passage of that statute, and which it was the purpose of the legislators to change by its enactment. And I submit, it is impossible to contend, that in the absence of that law, any foreign administrator or any other person can compel the collection of a private debt due here to his intestate, or pass title to personal property of the intestate found here, without first taking out letters of administration from the Orphans’ Court of the District.
Is there any ground for supposing that such an administration' is unnecessary and improper where the property belonging to the deceased consists of money due from the ■Government under an appropriation by law?
The money claimed in this case was appropriated by ■Congress to the Pulliams. They wore ascertained sums nominated in the statute and unchangeable to the extent of ;a cent by any officer jof the Government ; nor is it in the power of the Government, in any way, to resume ownership •of the fund. It belonged to the designated claimants as fully as any property they might justly call their own. It is so completely segregated from the unappropriated money in the Treasury, that by section 806 Revised Statutes, where ■such drafts as those before us, shall remain outstanding and ■unpaid for three years, their amount must be deposited by *379 the Treasurer and covered into the Treasury by warrants and be carried to the credit of the parties to whose favor they were issued, or to the persons entitled to receive pay therefor ; and carried into “ an appropriation account denominated ■outstanding liabilities.” It is not easy to devise a plan snore effectually earmarking the money called for by the draft with the name of its true owner.
And it is an important consideration, in view of the language of the court in 15 Peters, that the provision just cited was adopted in 1866, twenty-five years after that decision. In the same connection, in my opinion, it is important to notice the provision of the act of 1846, 6th August, entitled, “An act to provide for the better organization of the Treasury,” which recited that it had been found necessary to make further provision to enable the Treasurer the better to carry into effect the act of September 2,1789. ■
By section 1 of that statute — Rev. Stats., § 3591 — it was declared that “ the rooms provided in the Treasury building at the seat of Government for the use of the Treasurer, his assistants and clerks, with the fire-proof vaults and safes, erected for the safe keeping of the public money, and such other apartments as are provided as places of deposit for the public money, shall be the' Treasury of the United States.” The article provides for other places where public moneys shall be deposited, under the designation of mints, assay offices and offices of assistant treasurers. The superintendent of one of the mints and of an assay office are constituted assistant treasurers, and the statute declares that the rooms assigued by law to be occupied by the assistant treasurers, together with the fire proof vaults therein or connected therewith, shall be appropriated to the use of the assistant treasurers and for the safe keeping of the public moneys deposited with them respectively.
But when these depositaries are referred to in the laws, they are mentioned by distinctive names, in contradistinction to the establishment at Washington, which with its rooms and apartments was to be recognized as referred to whenever the word Treasury was used. This discrimination is preserved in several of the subsequent sections of the article.
*380 Thus, by §3615, all collectors and receivers of public moneys within the District of Columbia are required, when directed, to pay over all such moneys “to the Treasurer of the United States at the Treasury ; ” whereas, by the same section, the collectors and receivers of public moneys at New York, Philadelphia, &c., are required to pay such moneys to the assistant treasurers at their cities, at their offices respectively, not describing them as the Treasury.
So, by section 3641, the Postmaster General is authorized to transfer moneys belonging to the postal service between the Treasurer, assistant treasurers and designated depositaries at his discretion, &c., sustaining the idea that a transfer to an assistant treasurer is hot a transfer to the Treasurer, and describing the place of transfer as the official home of that officer.
In Cooke vs. United States, 91 U. S., 402, the Supreme Court declared that United States notes which are not made payable at any particular place are, consequently, in law, payable at the Treasury, and this is at the seat of Government, and in the Treasury Department; and that the receipt and payment by the assistant treasurer in New York of such notes, authorized to- be retired before maturity, was not a payment or redemption by or at the Treasury Department, and did not retire the notes without a further order of the Secretary.
Other provisions are to be found in the statutes where the expression “ Treasury of the United States ” is evidently used to denote only the office of the Treasurer located at Washington ; as is the case with respect to the redemption of the notes of national banks which have refused payment. The law says they shall be paid at the Treasury. Would any holder of such a bank note think of applying to an assistant treasurer or other depositary for its redemption ? He might ask for its redemption of every assistant treasurer and mint and assay office from Maine to Alaska, and he would receive a negative answer from every one, nor could he obtain the money until he should apply to the place designated in the law — the Treasury at Washington city. Of course, in a *381 general sense, all public moneys may be said to be in the Treasury, wherever they may be, but Congress did not mean to enact this truism. It "meant, as it seems to me, to draw a distinction between the Treasury proper and its branches and agencies ; to localize the chief treasure house of the nation at the seat of government ; at the place where the Treasurer is required to perform his public duties in the city of Washington, where this money now is.
Why should not the money represented by these debts, and set aside for their payment, be considered local assets here ? It has all the characteristics of other assets. It is vendible and assignable. By the testamentary law of Maryland of 1798, ch. 101, sub-ch. 14, § 3, in force here, “ a common warrant for land not executed or located in the lifetime of the deceased, shall be assets after his death, in the hands of an executor or administrator, and subject to distribution, as well as every debt due to, or just claim of the deceased.
That the money appropriated and set apart for the payment of these debts would constitute debts due to the deceased, and just claims on their part, it seems impossible to deny. If it is not assets somewhere, how can it be received by the foreign administrator in his jurisdiction ? And the Government is as much placing its own indebtedness upon the plane of the indebtedness of one of its own citizens, by admitting the claim of a foreign administrator to receive the money as assets, as it would be if it paid it at once to the administrator within the District. The common warrant spoken of in the section quoted above, was an incipient patent of State lands to be exchanged after location for a patent. That which it represented was still within the State offices not yet formulated or separated from the other possessions of the State ; and yet Maryland admitted that such a common warrant should be considered as assets of the deceased.
If the ubiquity properly claimed for the Government of the United States is to be ascribed to the debts due by the Government, there would seem to be no good reason why *382 those debts should not be payable as well in Washington as elsewhere. Ubiquity implies universal presence, not uniform absence. And if the debts are to be considered as everywhere, it is inconceivable to me that the money especially-appropriated and dedicated to pay them, evidenced by the Treasurer’s draft payable here, should be held to be absent from the only place in the country where in fact and truth it actually is — in the Treasury of the United States in Washington city.
It was only the debts of the Government which the court declared had no locality at the seat of government. But they are capable of being localized. A draft of the Treasurer payable at Boise city is not payable elsewhere, although the Treasurer might have directed its payment at some other-locality, in which case it would have been payable only at that place. These drafts are payable at Washington, at the-Treasury of the nation, and here only they are properly payable as they now stand.
Every consideration of propriety suggests the advantage-of making payment to a person appointed here, whose qualification, bond and character can readily be inquired into,, rather than to one who may-have administered at a great distance, and -without real assurance of safety to the fund..
And as it cannot be denied that, under the law as it now stands, there must be local administration here to pass title-to all other personalty that may be found here belonging to a non-resident, convenience and equal justice would dictate that this same tribunal should be allowed to administer-other personal effects in the form of moneys to be derived from the Government. Why should local creditors be driven to two iTval representatives, especially as the law of the-foreign jurisdiction might reject their claims, and they might thus be deprived of their just due because of the refusal of the Government authorities to pay the money to the administrator of the jurisdiction where the debts were-contracted, perhaps upon the faith that the claim against the Government was to be the source from which those, creditors were to be paid ?
*383 The other courts of the system within the District have repeatedly taken cognizance of suits respecting funds in the-Treasury claimed by rival parties, and have recognized that the moneys in these cases before them were within the District and the jurisdiction of its tribunals. It is true that in the early case of C1megys vs. Vasse, in 1825, the circuit court used this language : “ The fund out of which the claims are-to be paid are in the Treasury of the United States. Where is that? The Treasurer resides at Washington and the head of the Department; but is the money there ?” The bill was filed by a bankrupt, claiming an account from his assignees, and that they should discover what amount they intended to claim before a commission under a Spanish treaty on complainant’s account, and that they should be enjoined from receiving whatever amount might be decided by the commission under the treaty to be due on that claim, and that a like injunction should go against the Treasurer. It may be that the negative answer of the court to its own inquiry was predicated of the fact that the money had not yet been awarded to the claim, upon the theory enunciated by the-Supreme Court of the United States in the case of Clark vs. Clark, 17 How., 322, that “the fund had no existence till the award was made.”
But whatever may have been the reason for their refusal, it is certainly at variance with subsequent declarations of the same court, and of the Supreme Court of the United States. In the numerous cases arising under the mixed commissions for the adjustment of the claims between this country and Great Britain and Mexico, it seems to have been assumed that the money, after it had been placed in the Treasury for distribution to the American claimants by the Secretary of State or Secretary of the Treasury, was properly to be considered as at the seat of Government. Mr. Justice Wylie, in his opinion in McManus et al. vs. Standish et al., 1 Mackey, 152, examines a number of these cases at length and decides that this court had jurisdiction in that case. All the parties were non-residents, but all the essential ones, it was held, had appeared in the court. In the conclusion of *384 this branch of his opinion, he says: “We do not wish to intimate an opinion, or an impression even, that if the fund is in the Treasury, and if the party is not here, that that would make any difference. That is not the question to be decided in the cases now under consideration.- We are not required to go beyond the fact that the fund is in the Treasury here, and the parties claiming the fund are before the court; and this we hold gives us jurisdiction here.”
The money referred to in that case was paid by the Mexican Government, and was in the Treasury subject to the order of the Secretary of State, and the justice declares it is in the Treasury here.
In this large class of cases which have been before the courts of the District, and many of them before the Supreme Court upon appeal, the action of the courts seems to be consistent only with the idea that moneys thus circumstanced were to be considered as in the Treasury in Washington city.
Thus in the case of Whitney et al. vs. Dey et al., which was a contest between claimants to an awai’d under a Mexican commission, the bill which was filed in 1851, prayed for an injunction against the defendants, who were all nonresidents, and also against the Secretary of the Treasury, although he was not made a party to the suit.
The circuit court ordered the injunction to issue before answer or appearance, and it was issued as prayed, served upon the Secretary, and by him respected, as were also the subsequent orders passed by this court after its organization, requiring the payment by the Secretary of portions of the award.
The same course was pursued in the subsequent case of Clark vs. Clark, 17 How., 315 (which was cited with approval in Phelps vs. McDonald, 99 U. S., 806). There, too, the defendants were non-residents, and an injunction was issued against the Secretary of the Treasury, though he was not made a party.
In the case of Pemberton vs. Lockwood, 21 How., 257, the Secretary of State was made a defendant with others who *385 were non-residents, to a bill seeking payment of part of an award made to the owners of slaves liberated from the ship Creole. Mr.'Marcy, the Secretary, himself a distinguished jurist, answered the bill, not questioning the jurisdiction of the courts, the money having been placed in the Treasury to pay these awards upon the orders of the Secretary of State.
I will refer now to some cases not arising under the operation of a statute authorizing litigation in this jurisdiction, as was the case with respect to those we have been considering.
In the case of Ridgeway vs. Hayes, 5 Cranch C. C. R., 34, where an award by commissioners under a French treaty was the subject of controversy, one of the claimants applied to the circuit court for an injunction against the Treasury officers to prevent the payment of the money out of the ‘Treasury to the defendant. The language of the court in the case of Comegys vs. Vasse, before quoted, was cited to show a want of jurisdiction to grant the relief. But the Chief Justice replied : “In the present case the fund is placed in the Treasury of the United States as in a place of deposit only, and the United States are merely trustees ; ” and he proceeds to say that he cannot see why the United States, in cases in which they are merely stakeholders, should not submit to these decisions and aid those tribunals in the-due .administration of justice.
A similar decision was made in the case of Duthill, adm’r, vs. Courvault, reported in the same volume, in which Congress, to carry out a French treaty, made a provision for a suit to be brought in the District of Columbia. This was the case that went to the Supreme Court, and is reported in 14 Peters, 33.
In the case of Milner vs. Metz, 16 Peters, 221, Metz, as trustee, filed his bill against several non-residents, and the Secretary of the Treasury, as a co-defendant, to enjoin the receipt by the defendant of a sum appropriated by a private act of Congress to his assignor for extra services. The court granted a perpetual injunction as prayed, which was sustained by the Supreme Court on appeal. The jurisdiction *386 of the court could only have been based upon the idea that the money was within the jurisdiction of the court at the seat of Government, for there was no special statute conferring jurisdiction, and the defendants, except the Secretary, were residents of Pennsylvania.
The circumstances of the case of Kinney vs. Meguire, recently decided by the Equity Court, were very much like those of the present case. Several drafts had been issued by the Treasurer, under a private act of Congress, payable to the order of sundry sailors who had been impressed by Admiral Porter for service in the Red river during the war, and were captured and retained as prisoners until the close of hostilities. These drafts were delivered to Meguire, who-had been, and claimed to be still, their attorney. He was a resident of Ohio, and left the jurisdiction with the drafts in his possession. Kinney, who exhibited properly authenticated powers of attorney since the issue of the warrants,, applied to the Treasurer .for the issue of other drafts, and the-bill was filed to procure an injunction to forbid Meguire from asserting title under the drafts in his possession. Meguirenever answered, but there had been publication against him, under Sec. 787 Rev. Stats. D. C., which allow's that as a substitute for personal service “ in all actions at law or in equity which have for their immediate object the enforcement or establishment of any lawful right, claim or demand to or against any real or personal property within the jurisdiction of the court.” And the Equity Court decreed according to the prayer of the bill, after full argument,upon the ground that the money-belonging to the claimants, to pay which these drafts had been issued, was in the Treasury at Washington, and therefore wdthin the jurisdiction of the court. It was understood that other drafts would be issued by the Treasurer if the court should deci,de against the legal right of Meguire to retain those already issued.
It seems plain, then, that when the Orphans’ Court considered the funds claimed in this proceeding as localized so as to be proper subjects of jurisdiction here, it was but acting in accord with the established practice of the other branches-of the court.
*387 During the existence of the act of June 24, 1812, it was unnecessary and useless to take cognizance of such funds as local assets here, but this was because, and only because, of the existence of that statute.
The learned justice, in the opinion in Vaughan vs. Northup, in combatting the idea that the personal representative of a non-resident of the Government should take out letters within the District of Columbia before he could receive the claim, declares, “ such a doctrine has never yet been sanctioned by any practice of the Government.”
With due submission to the distinguished jurist, I venture the statement that the facts disclosed by our records do not bear out the assertion that it has not been the practice of the Government to pay claims to local administrators appointed by the Orphans’ Court of the District. The records of that tribunal abundantly show that from its origin it exercised the power of granting letters here upon property within the District of Columbia belonging to non-residents,, whether that property consisted of claims against the Government, or other “ debts due to, or just claims of the deceased.”
The dockets of administration very seldom furnish any memoranda indicating whether the deceased was a resident or a non-resident, and thus the number of references suggested in that manner are fewer, in all probability, than the facts would warrant. But the cases where- such memoranda occur have been examined, and two hundred and seventeen instances are found from 1801 to 1812 inclusive, where letters were granted on the estates of non-residents ; by far the larger number of whom are described as attached to the army or navy, or marine corps.
' The first of these cases was in July 22,1802, where letters were issued on the estate of a sailor late of the U. S. frigate President. In the same year letters were granted to the ex.ecutors of Gen’l Washington on his personal estate in this District. In 1805 administration was granted to Capt. Dan’l Cormick on the personal estates of twenty-nine persons late of the U. S. Marine Corps. It seems almost certain *388 that the object of this administration was to obtain pay or prize money due by the Government, as was expressed on the docket entries in a later case, “ to enable the father of Wm. Rogers to receive from the Government the pay due his dead son.”
In 1807 letters were granted on the personal estate of Chancellor Hanson, of Maryland.
The granting of such letters would naturally have been less frequent after the passage of the act of 1812, although it continued in each year from that time to a greater or less extent. Thus from 1813 to 1825 inclusive, letters were granted on the estates of non-residents in one hundred and seventy cases. Selecting another period, I find one hundred and twenty such cases, between 1836 and 1844, inclusive; and selecting still another period, fifty-nine such cases were between 1874 and 1877 inclusive.
The case of Mackey vs. Coxe in 18 Howard, already cited, shows that the Treasury officials about 1840, required the agent of the administrator of the deceased to take out letters in the District before they would pay him the money due his intestate. As expressed by Justice McLean in the opinion of the court: “ There appears to have been no creditors of the estate of Mackey in the District of Columbia, and letters of administration were obtained here, as necessary under the decision of the Treasury Department.” So, in the year 1849, letters of administration were granted to Andrew Wylie upon the estate of Samuel Baldwin, described in the proceedings as a citizen of Pennsylvania, and the administrator thus appointed, collected from the Treasury a considerable sum of money awarded to the estate of the intestate under the treaty with Mexico. There was no pretense that there were other assets here, and this payment was made while the act of 1812 was in force and eight years aftér the decision in Yaughan vs. Northup had been announced.
After the act of 1812, had been repealed the practice was continued, and though such applications were sometimes resisted, upon the authority of Vaughan vs. Northup, yet the *389 court appeared to have no difficulty in granting the letters'. A few of the more recent cases may be referred to here.
After the close of the war, the. executrix of Horatio Ames, of Connecticut, where she had taken out letters, applied for letters to the Orphans’ Court here, alleging that the expected assets consisted of a large claim against the Government for munitions of war furnished the Government. They were issued to her, and in 1871 application was made for their revocation, averring a waste of the moneys received from that source.
The application was granted, the objection appearing to have been made that under the act of 1812, the letters here were useless if not improper.
In 1875, however, after the repeal of that law, an application for letters here was made to the same court, and Nathaniel Wilson was appointed by Justice Olin, and gave bond in the penalty of $160,000.
In the same year James P. Hamilton was appointed administrator of Benjamin Early, and charged himself in his account of assets with $3,519.50, being “the amount received from the Treasury Department, of the United States for cotton seized and used by the United States Government.”
In 1876.letters were granted to Charles D. Pennebacker, upon the estate of one Snyder, of Hardin county, Kentucky; the petition alleging “ that Snyder had assets in the District of Columbia consisting of one U. S. Treasury draft, No. 5332, for $713,” which draft was then in the hands of the petitioner as the attorney of the deceased.
And on the same da3 letters were granted to Pennebacker on the estate of one Branham, of Kentucky, the assets being described as “ a claim allowed against the Government.”
In 1879, John Campbell applied for letters upon the personal estate of one Springer, of New York, alleging that, as administrator of Springer under letters issued at the place of the domicil, he’had brought suit in this District in respect of a claim due the estate ; but that the defendant, in his plea, had denied the right of a foreign administrator to maintain the suit, which plea had been sustained by the *390 General Term ; and he accordingly applied for the ancillary letters for that purpose, and the letters were issued accordingly.
In January, 1880, Allan Rutherford, of North Carolina, applied for and obtained letters upon the personal estate of F. W. Beers, of'New York, averring that he was a creditor of the deceased, and that “ the only property or personal estate left by the deceased is a Treasury draft, payable to the decedent,” and the court issued the letters.
And in March, 1881, Mr. Henkle, a member of this bar, applied for letters of administration upon the personal estate of John P. Sherburne, who, it was charged, resided in San Francisco, and had recently died there, leaving personal estate in the District of Columbia, consisting of a certain claim of about $1,500 against the United States, then in the Court of Claims. The petitioner averred that he had been the attorney of the claimant and as such was a creditor, and as the Attorney-General was urging the trial of the cases, it was necessary that an administration be granted here, and it was done accordingly.
The case of Gen. Burnside occurs to me as one of the more recent cases-. That distinguished and excellent gentleman died in Rhode Island, of which State he was a Senator in Congress. His administrators there applied for letters here in respect of his personal assets here, and passed their accounts here as required by law.
In 1876 a large number of letters were granted to Mr. Lowndes, upon the estates of Hawaiian sailors who had claims before the Alabama Claims Commission, and similar letters were recently granted to the same gentleman in seventy-six similar cases, where there had been administration in the place of their domicile ; but-it was represented to the Orphans’ Court that the rules of the Alabama Commission required that letters of administration should be taken out before the claims could be considered.
In fact, if the practice of a tribunal and its frequent claim of jurisdiction can be regarded in any case as proof to show the rightfulness of the claim, the consistent practice *391 of the Orphanss’ Court of the District of Columbia in this ■particular cannot fail to have great weight in support of the jurisdiction claimed.
I am unwilling to concede that this constant practice of our predecessors and of ourselves is unwarranted, and that the government officials have also been hitherto acting upon ■a similar incorrect construction of the law. On the contrary, I believe that since the repeal of the act of 1812, the jurisdiction of the Orphans’ Court of the District of 'Columbia to issue letters of administration, whether the property alleged to belong to the non-resident deceased consists of ordinary personal effects, or of claims or debts due to the deceased, whether by private individuals' or by the Government, is clear, and that it is its duty to grant the letters upon proper application and compliance with the requirements of the law.
We are all of the opinion that the writ should issue, requiring the Treasurer to make payment of the amounts specified in the three drafts, to the petitioner as administrator of John J. and of John N. Pulliam.
We cannot regard the decree of the Equity Court referred to in the petition, as effective at all against the administrator in Tennessee, since he is not amenable to suit as administrator in this jurisdiction.
The reservation in that decree, which requires the District administrator to account fully of the personal estates of his intestates, will allow full opportunity for a contest by those interested, if they believe Keyser’s claim is not ■properly supported by proof.
The several equity causes mentioned in this opinion have been referred to only for the purpose of showing that in those instances funds in the Treasury have been considered as localized here, and only for that purpose. Nor are we to be understood as intending to interfere, in the slightest degree with the wholesome principle, founded alike upon reasons of public policy and convenience, that exempts from attachment funds in the hands of government officials or other public officers.

Ante, p. 299.